IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOEL S. ARIO, Commissioner of      :
Insurance for the Commonwealth    :
of Pennsylvania, as Liquidator      :
of AMERICAN INTEGRITY         :
INSURANCE COMPANY,           :
        Plaintiff               :
                            :
        v.                :  CIVIL NO. 1:CV-98-0678
                            :
COLOGNE REINSURANCE        :
(BARBADOS), LTD.              :
        Defendant          :

*M E M O R A N D U M*

I.     *Introduction*

        This action was initiated by M. Diane Koken, as the Liquidator of American Integrity Insurance Company to recover on a reinsurance agreement American Integrity had with defendant, Cologne Reinsurance (Barbados), Ltd.[1]  The action was filed in the Pennsylvania Commonwealth Court, but removed here by Defendant.  After removal, we required the parties to arbitrate the dispute,  as the reinsurance agreement provided. *Koken v. Cologne Reinsurance (Barbados), Ltd.*, 34 F. Supp. 2d 240 (M.D. Pa. 1999).

        The action is before us now for a second time, on a motion by Defendant to confirm the May 2009 final arbitral award and a motion by Plaintiff to vacate the award in

---

[1]  Koken was formerly the Pennsylvania Insurance Commissioner.  Joel S. Ario is the current Commissioner, and he has been substituted as the plaintiff.

part.[2]  In its motion, Defendant argues that the award should be confirmed based on the narrow standard of review for arbitral awards.  In his motion, Plaintiff argues that the award should be vacated based on evident partiality by the arbitrators, or in the alternative, vacated in part because the arbitrators manifestly disregarded the law.[3]

II.      *Background*

In 1990, Cologne and American Integrity entered into a Coinsurance Agreement by which Cologne agreed to reinsure American Integrity for twenty percent of losses on certain nursing care, home-health care and medicare-supplement policies. The Agreement also required Cologne to post a letter of credit as security "for [its] Unearned Premium Reserves plus the sum of the Reinsurer's share of the Claims Reserves and the Active Life Reserves."  (Doc. 119, Costigan Decl., Ex. A, CM/ECF p. 11).

In June 1992, American Integrity and Cologne executed "Amendment 3" to the Agreement, allowing American Integrity to withhold reinsurance payments due to Cologne under the Coinsurance Agreement as security for Cologne's share of the

---

[2]  This award was made by the second panel to consider the parties' dispute.  A previous panel had issued a final award in March 2006.  On Defendant's motion to confirm that award and Plaintiff's motion to vacate it in part, we vacated the award in part in August 2006 and required the parties to arbitrate the issues raised by our decision before a different arbitration panel.  *See Koken v. Cologne Reinsurance (Barbados), Ltd.*, 2006 WL 2460902, 2006 U.S. Dist. LEXIS 59540 (M.D. Pa. Aug. 23, 2006).

[3]  The Liquidator also contends that the liquidator of an insolvent insurer should not be bound by that insurer's agreement to arbitrate.  However, he recognizes that we rejected this argument in our 1999 decision, 34 F. Supp. 2d at 256, and raises it here only to preserve it for appeal.

reserves necessary to cover any losses.  In return, Cologne could require American Integrity to establish a trust account (the "Trust Account") in which the withheld funds would be placed.  (*Id.*, Ex. A, CM/ECF p. 21).  The provision dealing with the letter of credit was amended so that the letter of credit could be in an amount "less the amount of any funds held by" American Integrity.  (*Id.*, Ex. A, CM/ECF p. 25).

In December 1992, the parties executed "Amendment 5" to the Coinsurance Agreement.  According to the Liquidator, Amendment 5 "broadened" the reinsurance "to a 95% quota share reinsurance of the otherwise unreinsured portions of American Integrity's Hospital Indemnity, Home Health Care, Hospital Surgical, Medical Surgical and Long Term Care (standard) coverages on specified policy forms."  (Doc. 120, the Liquidator's Opp'n Br. at p. 11, citing doc. 119, Ex. A).  The Trust Account provision was changed to now require American Integrity to place funds in the account and to define the original trust account balance as Cologne's share of the reserves, minus $6.5 million.    Additionally, a setoff provision in the Coinsurance Agreement was modified to allow the setoff of any debts between the parties, not just debts on the Coinsurance Agreement, as originally drafted.

At the same time as Amendment 5 was executed, the parties entered into the Stop Loss Agreement by which American Integrity would reinsure Cologne for some of the reinsurance Cologne provided American Integrity under the Coinsurance Agreement.  (Doc. 119, Ex. C, CM/ECF p. 66).

Upon petition to the Pennsylvania Commonwealth Court, American Integrity was ordered into liquidation on June 25, 1993.  This litigation was started to determine

what Cologne owes American Integrity's estate under the Coinsurance Agreement. At the first arbitration, the Liquidator argued that Cologne could not offset what it owed under the Coinsurance Agreement against American Integrity's obligation to reinsure Cologne under the Stop Loss Agreement because of 40 Pa. Stat. Ann. § 221.21 (West 1999). As applicable here, that statutory section provides that all insurance provided by a liquidated insurance company "shall continue in force" only "for a period of thirty days from the date of entry of the liquidation order."[4] The liquidator also argued that the combined effect of the Coinsurance Agreement and subsequent agreements the parties entered into, Amendment 5 and the Stop Loss Agreement, made Cologne's obligation under the Coinsurance Agreement "in the nature of a capital contribution" by virtue of being an increase in American Integrity's surplus. Hence under 40 Pa. Stat. Ann. § 221.32(b)(3)(West 1999), American Integrity's obligation under the Stop Loss Agreement could not be used to offset Cologne's obligation under the Coinsurance Agreement.[5]

The arbitrators rejected both arguments. In their final award dated March 17, 2006, they ruled in part that: (1) the statutory exceptions to setoff did not apply so the

---

[4] The section reads in full as follows:

All insurance in effect at the time of issuance [of] an order of liquidation shall continue in force only with respect to the risks in effect, at that time (i) for a period of thirty days from the date of entry of the liquidation order; (ii) until the normal expiration of the policy coverage; (iii) until the insured has replaced the insurance coverage with equivalent insurance in another insurer or otherwise terminated the policy; or (iv) until the liquidator has effected a transfer of the policy obligation pursuant to section 523(8), whichever time is less.

[5] Section 221.32(a) allows the offset of "[m]utual debts," but section 221.32(b)(3) bars an offset when the obligation is "in the nature of a capital contribution."

4

Liquidator's claim under the Coinsurance Agreement could be offset by Cologne's claim under the Stop Loss Agreement; and (2) "The Stop Loss Agreement did not terminate as of July 25, 1993 pursuant to 40 P.S. 221.21." *Koken, supra*, 2006 WL 2460902, at *2 (quoting the final award).[6]

As noted, Cologne moved in this court to confirm the award, and the Liquidator moved to vacate it in part. On August 23, 2006, we vacated the portion of the award ruling that the Stop Loss Agreement "did not terminate as of July 25, 1993." We decided instead (even under a manifest-error-of-law standard) that section 221.21 did apply so that the Stop Loss Agreement continued in force only until July 25, 1993, thirty days after the date of the liquidation order. *Koken, supra*, 2006 WL 2460902, at *8. Upon further motion, we required the parties to arbitrate the issues raised by our decision before a different arbitration panel. *See Koken v. Cologne Reinsurance (Barbados), Ltd.*, 2006 U.S. Dist. LEXIS 87888 (M.D. Pa. Dec. 5, 2006).

The Liquidator raised the following issues before the second arbitration panel. First, Cologne was obligated under the Coinsurance Agreement to pay the difference between its liability under that agreement and the amount on hand in the Trust Account. In the Liquidator's view, Cologne had an "obligation to secure any deficiency in the Trust Account relative to the reserves applicable to the reinsured business." (Doc. 119, Liquidator's post-hearing brief, CM/ECF pp. 82-83). This obligation arose from Amendment 3, which altered Cologne's obligation to fund the letter of credit by requiring it

---

[6] The panel also ordered that the Liquidator should surrender the letter of credit and that Cologne should surrender any interest in the Trust Account.

to take into account the amount of any funds American Integrity had placed in the Trust Account by subtracting that amount from the amount required to fund the letter of credit. In this argument, the Liquidator also pointed to Amendment 5, which specifically defined the amount in the Trust Account as Cologne's share of the reserves, minus $6.5 million, that is, defining the amount by taking $6.5 million off the top and thus, as argued, leaving Cologne with the responsibility of making up the difference in the letter of credit.[7]

Second, the Liquidator argued that Cologne owed American Integrity for Cologne's reinsurance share of the American Integrity policies that the National Organization of Life and Health Guaranty Associations (NOLHGA) transferred to two other insurance companies, UNUM Life Insurance Company of America and MEGA Life and Health Insurance Company.[8] The Liquidator based this argument in part on the Insolvency Clause of the Coinsurance Agreement (doc. 119, Costigan Decl., Ex. A, CM/ECF p. 35), which keeps the reinsurance in force, and payable to American Integrity or the Liquidator, even if American Integrity becomes insolvent. The Liquidator calculated Cologne's share of this "assumption funding" as: (1) the claimed $4.7 million deficiency in the reserves based on Amendment 5's definition of the amount that should be in the Trust Account; and (2) $4.2 million, representing Cologne's share of additional

---

[7] According to the Liquidator, the $6.5 million had amortized downward to a $4.7 million deficiency, one of the sums the Liquidator sought from Cologne before and during arbitration. (Doc. 119, Liquidator's post-hearing Br. at CM/ECF p. 86).

[8] As noted, section 221.21 provides that policies continue in force only for thirty days at most, but the Liquidator points to a Pennsylvania statute, the Pennsylvania Life and Health Insurance Guaranty Association Act (PLHIGA), 40 Pa. Stat. Ann. § 991.1701 et seq, that required that the two kinds of insurance policies provided by American Integrity, long-term and non-long-term care policies, remain in force generally until they can be assumed by a solvent insurer. UNUM took over the long-term care policies and MEGA the non-long-term care policies.

Active Life Reserves that had been transferred to UNUM.  The Liquidator contended that the transfer of American Integrity's policy obligations to solvent insurers was reasonably foreseeable, that the amounts paid the assuming insurers was necessarily based on actuarial estimates, that the assumption payments were actually made to the assuming insurers and that Cologne consented to the assumption agreements.

On August 14, 2008, the second panel issued its first Interim Award.  (Doc. 112, CM/ECF p. 100).  First, the panel rejected the Liquidator's argument that Cologne was obligated under the Coinsurance Agreement to pay the difference between its liability under that agreement and the amount on hand in the Trust Account by virtue of Cologne's obligation to make up deficiencies in the Trust Account by contributions to the letter of credit.  The panel viewed this as an argument that Cologne had an obligation to fund the Trust Account and stated "that there was no intent that Cologne [ ] has the responsibility to fund the Trust Account." (*Id.*, CM/ECF p. 100).  The panel thus ruled that Cologne could use the Trust Account to offset any liability it had under the Coinsurance Agreement.

The panel then turned to the effect of our ruling that the Stop Loss Agreement continued in force only until July 25, 1993.  It construed this to mean that the Stop Loss Agreement terminated on July 25, 1993, and then proceeded to determine the effect of that termination on American Integrity's obligations to Cologne under the Stop Loss Agreement.  The Stop Loss Agreement had no clause dealing with termination, but it did provide that reinsurance under the agreement was subject to the terms and conditions of the Coinsurance Agreement, so the panel looked to the termination clause

in the latter agreement. That clause provided that: "In the event of termination, the Reinsurer will remain liable for any loss or losses incurred from policies issued and in force prior to termination." (Doc. 112-2, CM/ECF p. 1). The panel thus "rule[d] that following termination of the Stop Loss Agreement pursuant to 40 P.S. § 221.21, American Integrity retained liability to Cologne [ ] for the Reinsured Policies that were in force as of July 25, 1993, and for losses incurred as of July 25, 1993." (*Id.*, CM/ECF p. 1). The liability would terminate on the effective dates of the assumption agreements, which was October 1, 1993, for UNUM, and June 1, 1994, for MEGA. The panel further ruled that American Integrity's liabilities under the Stop Loss Agreement could be offset by Cologne's liabilities under the Coinsurance Agreement,(*id.*), that Cologne's liability under the Coinsurance Agreement could not be established by estimates, and that its liability under the Coinsurance Agreement did not extend to any claims or losses paid under the Reinsured Policies after the effective dates of the UNUM and MEGA assumption agreements.

The panel deferred ruling on two issues: (1) whether the Stop Loss Agreement applied to policies in force after the termination date of July 25, 1993, and for losses incurred thereafter; and (2) "whether payments made by the Guaranty Funds to UNUM and MEGA to induce those companies to assume the Reinsured Policies may be ceded to Cologne [ ] as losses under the Coinsurance Agreement." (*Id.*).

On August 25, 2008, the panel issued Interim Award #2, which addressed the first deferred issue, ruling as follows:

> Using the same rationale as expressed in the initial Interim Award, we hereby rule that losses incurred on policies still in

> force after the termination date of July 25, 1993 for which
> claims were noticed and losses paid prior to the Effective
> Dates of the Assumption Agreements are losses to which both
> the Coinsurance Agreement and Stop Loss agreement
> respond and are subject to offset.

(Doc. 112-2, CM/ECF pp. 4-5). Thereafter, the parties engaged in discovery.

On July 29, 2008, the panel's umpire was selected to be the umpire for another arbitration where Cologne's party-appointed arbitrator was also a party-appointed arbitrator. On November 12, 2008, the Liquidator's party-appointed arbitrator was chosen as umpire for an arbitration where a Cologne affiliate was a party. Mostly on this basis, on or about December 10, 2008, the Liquidator filed a motion for the panel members to recuse themselves for evident partiality.[9]

An evidentiary hearing on the merits was held on February 18, 19 and 20, 2009. The panel issued its Final Award on May 27, 2009, incorporating the first two interim awards and making the following rulings. First, a share of the payments made to UNUM and MEGA under the assumption agreements could not be recovered against Cologne under the Coinsurance Agreement because the Liquidator's powers under state law "to transfer policy obligations to solvent assuming insurers do not create or give rise to claims for reinsurance recoveries under the Coinsurance Agreement," and "[t]here are no provisions in the Coinsurance Agreement that would cause such a transfer to give rise to such claims." (Doc. 112, CM/ECF p. 95 ¶ 3).

---

[9] We provide more detail on the recusal issue in the later section of this memorandum dealing with the Liquidator's claim of evident partiality.

Second, for any losses that could be ceded to Cologne under the Coinsurance Agreement, the Liquidator failed to prove what the actual losses were, providing only estimations, and the Liquidator was specifically advised in the initial Interim Award that estimates were not enough. (*Id.* CM/ECF p. 95 ¶ 4). Third, the Liquidator could not use the follow-the-settlements doctrine to recover for the assumption payments as that doctrine applies only to settlements made with policyholders for risks covered by insurance and reinsurance and the assumption payments "do not arise from liability to policyholders, nor are they encompassed within American Integrity's insurance liability nor Cologne's [ ] reinsurance liability." (*Id.* CM/ECF p. 95 ¶ 5).

Fourth, the Liquidator's claim for the $4.7 million deficiency in the Trust Account could not be recovered from Cologne, in part, because in the first Interim Award, the panel already decided that there was no intent that Cologne fund the Trust Account. Additionally, the amount was for claims already incurred by June 30, 1993, and would be subject to offset by American Integrity's obligations under the Stop Loss Agreement. (*Id.* CM/ECF p. 95 ¶ 6).

Fifth, the Liquidator's claim for $4.2 million, representing Cologne's share of additional Active Life Reserves that had been transferred to UNUM, could not be recovered from Cologne, in part, because "losses incurred on policies still in force after the termination date of the Stop Loss of July 25, 1993, for which claims were noticed and losses paid prior to the Effective Dates of the Assumption Reinsurance Agreements, are losses" covered by both the Coinsurance Agreement and the Stop Loss Agreement and subject to offset. (*Id.*, CM/ECF pp. 95-96 ¶ 7). "Further, it was established conclusively

at the Hearing that this component arises from amounts voluntarily paid to UNUM by the Guaranty Associations in forbearance of future rate increases," not from "any insurance obligation of American Integrity" or reinsurance obligation of Cologne.  (*Id.*, CM/ECF p. 96 ¶ 7).[10]

Finally, the panel ruled that Cologne had to surrender any interest in the Trust Account to the Liquidator and that the Liquidator had to surrender any interest in the letter of credit to Cologne.

The Final Award also addressed the Liquidator's motion for the panel members to recuse themselves.  The panel denied the request for two main reasons.  First, service on panels dealing with unrelated arbitration matters was not a sufficient conflict to require recusal.  Second, the first Interim Award had been issued before the two panel members had obtained their appointments on the other panels.  Hence that award could not have been influenced by their appointments.  Further, the award required that the Liquidator prove actual losses, but she provided only estimates, "a complete failure by American Integrity to present any specific evidence as required in support of its claims."  (*Id.*, CM/ECF p. 97 ¶ 15).

---

[10]  The views expressed in ¶¶ 3 through 7 were those of two members of the panel. The third member nonetheless concurred in the result, differing only in reasoning.

III.    *Discussion*

    A.    *Manifest Disregard of the Law*

    The Liquidator attacks the merits of the arbitral award by asserting that it is in manifest disregard of the law.  Citing *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), Cologne challenges the continued vitality of the manifest-disregard-of-the-law standard.

    In *Hall Street*, the Supreme Court called into question whether courts can add grounds for reviewing an arbitration award to the statutory ones set forth in the Federal Arbitration Act (FAA).  *Id.* at __, 128 S.Ct. at 1403-04.  In doing so, the Court questioned *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), where *Wilko* discussed manifest disregard of the law as a ground for vacating an arbitral award. However, we conclude, and as the Court speculated in *Hall Street*, that this standard is simply "judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA," *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 94 (2d Cir. 2008), *cert. granted*, 129 S.Ct. 2793, 174 L.Ed.2d 289 (U.S. June 15, 2009)(No. 08-1198).  Hence the manifest-disregard-of-the-law standard may be employed in reviewing an award, for a claim that arbitrators acted in manifest disregard of the law is just another way of saying that the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  *Id.* at 95 (quoting 9 U.S.C. § 10(a)(4)).[11]

---

    [11]  This case falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), chapter 2 of the Federal Arbitration Act

As we noted in a prior memorandum in this case, manifest disregard of the law occurs when "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Koken*, *supra*, 2006 WL 2460902, at *6 (M.D. Pa. Aug. 23, 2006). An erroneous interpretation of the law is not enough. *Id.*

The Liquidator first challenges the panel's ruling that the Stop Loss Agreement covered losses incurred on policies still in force after the termination date of July 25, 1993, for claims noticed and losses paid before the effective dates of the assumption agreements, which meant that these losses were subject to offset. The Liquidator asserts that this ruling contradicts our decision that the Stop Loss Agreement continued in force only until July 25, 1993. He also argues that the reasoning used to support it is "nonsensical" because the contractual termination provision in the Coinsurance Agreement cannot override a "*statutory* discontinuation of coverage." (Doc. 120, Liquidator's Opp'n Br. at p. 19 and n. 11).

───────────────────────

(FAA), 9 U.S.C. §§ 201-208. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, __ F.3d __, __, 2009 WL 3297322, at *2 n.5 (3d Cir. 2009)("As germane here, an arbitration agreement or arbitral award falls under the Convention if it arises out of a legal relationship that is (1) commercial and (2) between parties at least one of whom is not a United States citizen."). As such, reliance on section 10, a part of the "domestic FAA," is proper. The New York Convention allows the state in which the award was made "to set aside or modify [the] award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Koken*, *supra*, 2006 WL 2460902, at *5 (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). This means that in addition to the grounds for relief set forth in the Convention in Article V, we can look to the grounds for relief in the FAA at 9 U.S.C. § 10. *Yusuf Ahmed*, 126 F.3d at 19-20. Our authority for doing the latter is by way of Article V(1)(e) of the Convention. *Id.* at 21. We note that chapter one of the FAA, 9 U.S.C. §§ 1-16, is the "domestic FAA." *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 584 (3d Cir. 2007).

We reject this argument. We did rule that the Stop Loss Agreement continued in force only until July 25, 1993, but we cannot say that the panel's resolution of issues raised by that ruling was in manifest disregard of the law.

The Liquidator next argues that the two-member majority on the panel manifestly disregarded the law by ruling that Cologne did not have to pay a portion of the assumption funding paid to UNUM and MEGA when certain American Integrity policies were transferred to them. The Liquidator relies on his argument based on the Insolvency Clause in Amendment 5, which requires Cologne to maintain the reinsurance even if American Integrity became insolvent. However, we are satisfied that this ruling is not in manifest disregard of the law based on the panel's reasoning that this transfer of policy obligations to solvent assuming insurers is not the same as a claim for reinsurance under the Coinsurance Agreement.

The Liquidator next argues that the arbitrators manifestly disregarded the law by ruling that Cologne did not have to make up the difference between its liability under the Coinsurance Agreement and the amount on hand in the Trust Account. On this argument, the Liquidator relies on its argument that Cologne was obligated to make up deficiencies in the Trust Account by contributions to the letter of credit. He stresses that the arbitrators' conclusion that Cologne had no obligation to fund the Trust Account "is simply premised on an otherwise meaningless semantic distinction between putting the $4.7 million difference into the Trust Account (something the Liquidator never contended Cologne was obligated to do) and securing it via a letter of credit (something Cologne was indubitably obligated to do)." (Doc. 120, Liquidator's Opp'n Br. at p. 20).

14

The reasoning of the arbitrators on this issue is conclusory, as well as is Cologne's argument in support of them, but we do not think we can conclude that the arbitrators made a manifest error of law here; Cologne did not have any contractual obligation to fund the Trust Account.

Finally, the Liquidator argues that the arbitrators manifestly disregarded the law in ruling that the Liquidator's claim for $4.2 million, representing Cologne's share of additional Active Life Reserves that had been transferred to UNUM, could not be recovered from Cologne. The arbitrators based this ruling in part on evidence at the hearing that they said conclusively established that this sum "arises from amounts voluntarily paid to UNUM by the Guaranty Associations in forbearance of future rate increases," not from "any insurance obligation of American Integrity" or reinsurance obligation of Cologne.[12]

The Liquidator objects that this "reverses the hearing testimony, which was that both the guaranty associations . . . and UNUM recognized that the existing premiums flows on the Cologne-reinsured policies would be insufficient to cover future losses and that UNUM did not want the burden of applying to the various state regulators for increases." (Doc. 120, Liquidator's Opp'n Br. at p. 21). We reject the Liquidator's argument because she has not provided us with the record to support it and because the argument essentially is the same as the arbitrators' reasoning, only expressed differently.

_____

[12] The arbitrators also stated as a reason that these were losses covered by both the Coinsurance Agreement and the Stop Loss Agreement and subject to offset.

B.    *Evident Partiality*

Plaintiff asserts that the award must be vacated on the basis of "evident partiality."  Under the FAA, 9 U.S.C. § 10(a)(2), a court may vacate an arbitral award "where there was evident partiality . . . in the arbitrators."

"In order to show 'evident partiality,' the challenging party must show a reasonable person would have to conclude that the arbitrator was partial to the other party to the arbitration."  *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994)(internal quotation marks and quoted case omitted).  *See also Dauphin Precision Tool v. United Steel Workers*, 2009 WL 2038632, at *2 (3d Cir. 2009)(nonprecedential)(quoting *Kaplan*).  "'Evident partiality' is strong language and requires proof of circumstances 'powerfully suggestive of bias.'"  *Kaplan*, 19 F.3d at 1523 n.30 (quoted case omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*, 272 Fed. Appx. 174, 176 (3d Cir. 2008) (nonprecedential).[13]

The background for this issue is as follows.  The arbitration panel consisted of three members.  Diane Nergaard was Cologne's party-appointed arbitrator, Andrew Walsh was the Liquidator's party-appointed arbitrator, and Caleb Fowler was the umpire, the neutral third arbitrator picked by the two party arbitrators.  According to the

---

[13]  In *HSM Constr. Servs., Inc. v. MDC Sys., Inc.*, 239 Fed. Appx. 748, 752-53 (3d Cir. 2007)(nonprecedential), the Third Circuit recognized some tension between its standard and language in *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968), in which the Supreme Court talked about the "evident partiality" statutory standard precluding even an "appearance of bias."  In *HSM Constr. Servs.*, the court declined to resolve the apparent conflict because even under an appearance-of-bias standard, there was no disqualifying partiality in that case.  We also conclude that, even if an appearance-of-bias standard applied here, the result would be the same.

Liquidator's counsel, he asked Walsh to inform him of any attempt by Cologne to influence him. (Doc. 119, Costigan recusal Aff. ¶ 3).

Before being chosen as the umpire, Fowler answered an umpire questionnaire the parties adapted from a standard AIDA Reinsurance and Insurance Arbitration Society ("ARIAS") form. In pertinent part, the questionnaire inquired about service on prior arbitration panels with either of the party-appointed arbitrators. Fowler indicated in his July 16, 2007, response that he had served on one panel (since concluded) with Nergaard when she was the umpire and on another panel with her for a stayed arbitration where they were the two party arbitrators. (*Id.* ¶ 6).

On November 15, 2007, Fowler was selected as the umpire. He was paid a non-refundable $20,000 retainer ($10,00 from each party) and $625 per hour. (*Id.* ¶ 7). In April and May 2008, the parties submitted briefs on certain issues for "summary disposition," which were argued on June 11, 2008. (*Id.* ¶ 8).

Nergaard was serving as a party-appointed arbitrator in another case. The arbitration clause in that case, as in the instant one, provided that the umpire would be chosen by the two party arbitrators. On July 7, 2008, Fowler was sent an umpire questionnaire in that case, and on July 29, 2008, selected to be the umpire. He received compensation similar to what he was receiving for the instant arbitration. None of this was disclosed at the time to the Liquidator. (*Id.* ¶¶ 9-10).

On August 14, 2008, the panel issued its first interim award, and on August 25, 2008, its second interim award. On September 25, 2008, Fowler sent an e-mail to counsel disclosing that he had been appointed the umpire for the arbitration where

Nergaard was a party-appointed arbitrator and that "the issues, parties and counsel are all different than this proceeding." He did not disclose when he was contacted or appointed. (*Id.* ¶ 12).

In October 2008, Walsh completed an umpire questionnaire for an arbitration where a Cologne affiliate was a party, and on November 12, 2008, he was appointed umpire. His financial rate was "somewhat higher" than the one for the instant arbitration. This information was not disclosed to the Liquidator until September 25, 2008, the same day Fowler disclosed that he was the umpire in the matter where Nergaard was the party arbitrator and after the Liquidator's counsel had e-mailed Fowler in reply. (*Id.* ¶¶ 14-15). According to an e-mail sent by Walsh on December 18, 2008, this new arbitration "settled prior to an organizational meeting being held." (Doc. 125-3, Bello Decl., Ex. E, CM/ECF p. 2).

In seeking to vacate the award on the basis of the arbitrators' evident partiality, the Liquidator makes the following arguments. Fowler's agreement to be the umpire for another arbitration after being selected (in part) for that arbitration by Cologne's party arbitrator here (Nergaard) was a ground for recusal. (Doc. 120, Liquidator's Opp'n Br. at p. 15).[14] The Liquidator argues that the appointment gave Fowler a pecuniary interest that created an appearance of bias forbidden by *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 148, 89 S.Ct. 337,

---

[14] Like here, the umpire in that arbitration was to be chosen by the two party arbitrators. Fowler asserts he does not know how he was chosen, but there is no reason to assume that it was not done by the one provided for in that arbitration, and a commonplace procedure for selecting an umpire.

339, 21 L.Ed.2d 301 (1968).  In that case, the Supreme Court set aside an arbitral award for evident partiality when it had not been disclosed that one of the parties to the arbitration had been a regular customer of the umpire for four or five years before the arbitration, even though the last business dealings had been about a year before the arbitration.  The Supreme Court stated that "the slightest pecuniary interest" is sufficient to set aside an award.  *Id.*  In *Commonwealth Coatings*, the transaction was between the umpire and a party, but the Liquidator argues that accepting the engagement from Nergaard was "very much the same as accepting such an engagement from Cologne itself," based on *Lozano v. Maryland Cas. Co.*, 850 F.2d 1470, 1472 (11th Cir. 1988), where the court stated that "[a]n arbitrator appointed by a party is a partisan only one step removed from the controversy . . . ."  (Doc. 120, Liquidator's Opp'n Br. at p. 15).

As further support for the proposition that acceptance of an arbitral position from a party arbitrator is the same as accepting business from the party itself, the Liquidator cites *Crow Const. Co. v. Jeffrey M. Brown Assoc. Inc.*, 264 F. Supp. 2d 217, 225 (E.D. Pa. 2003).  In *Crow Const. Co.*, the court vacated an arbitration award partially on the basis that in agreeing to arbitrate another matter for one of the parties to the arbitration, an arbitrator accepted compensation for performing his duties in that other arbitration directly from the law firm for that party.  In doing so, the court observed that "[c]ertainly any time money changes hands directly between an arbitrator and a representative of one of the parties involved in a pending arbitration before that arbitrator, disclosure must take place."  *Id.*

As an additional ground for Fowler's disqualification, the Liquidator argues that while he did disclose his appointment in the other arbitration, he failed to disclose it in a timely manner. Fowler's appointment in the other arbitration was on July 29, 2008, but he did not disclose it until September 25, 2008. In the meantime, the first and second Interim Awards were filed on August 14 and 25, 2008. Additionally, when he did disclose, he failed to disclose when he was appointed. The Liquidator cites in support *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 637 (Tex. 1997)(neutral arbitrator should have disclosed some substantial business he received while the arbitration was ongoing from the law firm of a party-appointed arbitrator, observing that while there is no duty to disclose trivial matters, a conscientious arbitrator should err in favor of disclosure).

As for Nergaard, the Liquidator argues she acted improperly by arranging for Fowler's appointment as the umpire in the other matter and then by failing to disclose it. The Liquidator argues Walsh should have recused himself because his conduct was similar to Fowler's; Walsh accepted appointment as the umpire for an arbitration where a Cologne affiliate was a party and did not disclose that in a timely fashion. The Liquidator contends that an affiliate "is even more strongly identified with the party than a 'representative' such as an attorney or party-appointed arbitrator." (doc. 120, Liquidator's Opp'n Br. at p. 18). Hence *Crow Const. Co.*, *supra*, applies even more strongly to Walsh than to Fowler when it disapproved of the failure to disclose "'money chang[ing] hands' between a party representative and an arbitrator during the course of an arbitration," (*id.*, quoting *Crow Const. Co.*, 264 F. Supp. 2d at 225), as here there was (or would have been) an exchange between an arbitrator and a party affiliate, not just a representative.

We reject the Liquidator's position. We note initially our disagreement with the Liquidator that Fowler's and Walsh's disclosures of their appointments were not timely. Disclosure is required so that the affected party can deal with the issue while the matter is still before the arbitrators. *See Crow Const. Co.*, supra, 264 F. Supp. 2d at 224-25 (disclosure is necessary so that a party may have a chance to respond accordingly). In the instant case, while the disclosures came after the first two interim awards, they were made while proceedings were still pending before the panel, and in fact the Liquidator was able to file a motion requesting that the arbitrators recuse themselves. Hence disclosure of any conflict was timely in this case.

We also conclude that there is no evident partiality from an arbitrator's accepting a position as an umpire in another, unrelated arbitration while the current arbitration is still ongoing, even if that position was partially obtained by the action of a party-appointed arbitrator, or is a position in an arbitration where one of the parties is an affiliate of a party to the current arbitration. Reinsurance is a field sufficiently specialized that those with expertise can be expected to serve on multiple arbitration panels. *See* doc. 125, Bello Decl. ¶ 4 (affirming that individuals with expertise in reinsurance can be expected to serve on multiple panels simultaneously). In these circumstances, as Cologne points out, "that arbitrators appoint each other to panels does not *per se* manifest 'evident partiality or corruption.'" *Lozano*, *supra*, 850 F.2d at 1473 (citing *In re Andros Compania Maritima, S.A.*, 579 F.2d 691, 701-02 (2d Cir. 1978)). The same conclusion is true for arbitrators who are appointed to a panel in which one party is an affiliate of a party to the current arbitration. *See also Nationwide Mut. Ins. Co. v. Home*

*Ins. Co.*, 429 F.3d 640, 647 (6th Cir. 2005)("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results.")(quoting *Int'l Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 552 (2d Cir. 1981)).[15]

The cases the Liquidator cites are distinguishable. In *Commonwealth Coatings*, the neutral arbitrator had received compensation directly from one of the parties for services rendered. In *Burlington N. R.R. Co.,* the neutral arbitrator had received some substantial business from the law firm of a party-appointed arbitrator. In *Crow Const. Co.*, an arbitrator had accepted compensation for performing his duties in

---

[15] As argued by Cologne, there is also support for this conclusion from the ARIAS US Practical Guide to Reinsurance Arbitration Procedure. ARIAS-U.S. is the American affiliate of the AIDA Reinsurance and Insurance Arbitration Society. According to its website, www.arias-us.org, ARIAS is a "not-for-profit corporation that promotes improvement of the insurance and reinsurance arbitration process for the international and domestic markets." Chapter II ¶ 2.3, comment A of the Guide (emphasis added) speaks about contract language requiring "disinterested" arbitrators, and that the arbitrators should be "financially disinterested." The comment does not exclude arbitrators from that category who receive compensation from parties, as long as the compensation is for work as an arbitrator or umpire. It reads in part:

> Regardless of specific contract language, however, it is accepted practice that all arbitrators should be financially disinterested and not under any party's control, and that the umpire should be neutral. Examples of a "financial interest" include contingent fee arrangements, bonuses tied to a result, employment by another reinsurer or cedent on the same risk at issue, or a financial investment in a company that may be materially affected by the outcome of the proceedings. An arbitrator is "under the control" of a party when he or she is an employee, officer or director of that party *or receives a consulting fee or other remuneration or compensation from that party other than as an arbitrator or umpire.*

the other arbitration directly from the law firm for that party.  By contrast, in the instant case, there is no evidence that either Fowler or Walsh received any compensation directly either from a party or from a law firm for a party, or was compensated for any business services rendered for that entity.  Instead, they acted only as arbitrators and any compensation received was for their roles as arbitrators.  In these circumstances, there was no evident partiality and no grounds for recusal of any of the arbitrators.

IV.	*Conclusion*

Since we have decided the Liquidator presents no grounds to vacate the arbitral award, we will grant Cologne's motion to confirm it.  We note the Liquidator requested oral argument, but we believed briefing was sufficient to dispose of the parties' motions, hence we did not schedule oral argument.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: November 13, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOEL S. ARIO, Commissioner of   :
Insurance for the Commonwealth  :
of Pennsylvania, as Liquidator    :
of AMERICAN INTEGRITY       :
INSURANCE COMPANY,        :
      Plaintiff             :
                          :
      v.                   : CIVIL NO. 1:CV-98-0678
                          :
COLOGNE REINSURANCE       :
(BARBADOS), LTD.            :
      Defendant         :

*O R D E R*

AND NOW, this 13th day of November, 2009, it is ordered that:

1. The plaintiff Liquidator's cross-motion (doc. 118) to vacate the arbitral award in part is denied.

2. The motion of defendant Cologne Reinsurance (Barbados) Ltd, to confirm the arbitral award (doc. 113) is granted.

3. The final arbitral award dated May 27, 2009, between the parties is hereby confirmed.

/s/William W. Caldwell
William W. Caldwell
United States District Judge